UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
                                        :
                                        :
GLORIA BOLANOS PONS and                 :
AITOR RODRIGUEZ SORIA,                   :
                                        :
            Plaintiffs,                  :
                                        :            06 Civ. 13221 (RJH)
      - against -                        :
                                        :        **<u>MEMORANDUM OPINION</u>**
THE PEOPLE'S REPUBLIC OF CHINA           :              **<u>AND ORDER</u>**
                                        :
                                        :
            Defendant.                   :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


        Plaintiffs Gloria Bolanos Pons and Aitor Rodriguez Soria bring an action against

defendant People's Republic of China ("PRC") seeking to recover on defaulted bonds

issued by the PRC's predecessor government in 1913 and to enjoin the PRC from paying

any of its other creditors unless plaintiffs are paid a pro rata share.  The PRC moves to

dismiss plaintiffs' complaint on the grounds that: (1) it is entitled to sovereign immunity

and none of the exceptions enumerated in the Foreign Sovereign Immunities Act of 1976

("FSIA") are applicable; (2) the statute of limitations has expired; (3) equitable relief is

inappropriate; and (4) the action is barred by the comprehensive settlement of existing

claims of United States nationals against the PRC under the International Claims

Settlement Act[1] and a 1979 treaty between the two nations.[2]  For the reasons that follow,

---

[1] *See* 22 U.S.C. §§ 1622, 1643 (2006).
[2] Agreement Between the Government of the United States of America and the Government of the People's
Republic of China Concerning the Settlement of Claims, May 11, 1979, 30 U.S.T. 1957.

the Court concludes that it lacks subject matter jurisdiction over plaintiffs' complaint because the PRC is entitled to sovereign immunity and none of the FSIA exceptions apply.  Specifically, plaintiffs have failed to show that the default had a "direct effect in the U.S." sufficient for purposes of the FSIA commercial activity exception.  Further, the Court concludes that even if it had jurisdiction over plaintiffs' claims, they would be barred by the applicable statute of limitations.  Because these issues are dispositive, the Court does not address whether plaintiffs' claims are also barred by the International Claims Settlement Act or the 1979 treaty.

## BACKGROUND

The facts of this case are similar to those of its predecessor, *Morris v. People's Republic of China*, 478 F. Supp. 2d 562 (S.D.N.Y. 2007) and familiarity with that case is assumed.  A brief exposition follows.  In 1913 under the Chinese Government Reorganization Loan Agreement ("Loan Agreement"), an international consortium of banks loaned the Republic of China £ 25,000,000 and in turn issued bonds for the value of that loan, secured by revenues from the Salt Administration of China. (Loan Agreement, Arts. IV, VI).  Importantly, American banks were excluded from the loan agreement after President Woodrow Wilson refused to support American participation, on the grounds that the loan imposed on China's sovereignty.  As a result, the bonds were not payable in the United States or in U.S. dollars.  Rather, payment was available only in each of five other countries in their respective currencies.  Purchasers, however, were not excluded from re-selling the bonds on secondary markets such as those in the United

States, and it is through such secondary sales that plaintiffs' predecessors are said to have come into possession of some of the bonds.[3]

Following a revolution in 1949, the newly formed PRC ceased making interest payments on the bonds, and on their maturation in 1960 failed to pay the principal. Plaintiffs claim that unidentified U.S. bondholders received interest payments in the U.S. prior to default, and state that they themselves held the bonds in the U.S. at the time of default on the principal in 1960.  In 1968 the Foreign Claims Settlement Commission heard claims by U.S. nationals for losses resulting from the PRC takeover, including those from American citizens holding the salt bonds, although those claims were ultimately rejected.  In a 1979 treaty the U.S. and the PRC normalized diplomatic relations and agreed to a comprehensive settlement of all property claims of U.S. nationals against the PRC "arising from any nationalization, expropriation, intervention, and other taking . . . on or after October 1, 1949, and prior to [the agreement date]." (Agreement Between the Government of the United States of American and the Government of the People's Republic of China Concerning the Settlement of Claims, May 11, 1979, 30 U.S.T. 1957).  Finally, in 1983 following a United States district court decision rendering a default judgment against the PRC for certain defaulted bonds not including the 1913 bonds, *see Jackson v. PRC*, 550 F. Supp. 869 (N.D. Ala. 1982), the PRC sent a diplomatic notice to the United States disclaiming obligations to repay any debts incurred by defunct Chinese governments.  After all this, plaintiffs now bring suit

---

[3] The bonds at issue in this action are shrouded in some mystery.  Plaintiffs claim that they were purchased by plaintiff Pons' father, but do not say when.  Plaintiffs claim to have received them in 1955 – the same year that the PRC issued a statement disclaiming the debt – but do not explain how or why.  Finally, plaintiffs refer to interest payments made on the bonds but provide no dates or details.  The only facts about the bonds that are alleged with any specificity are their value: plaintiffs assert that their bonds are worth in the aggregate over two billion dollars, or precisely $2,392,194,873.00.

in United States federal court to enforce the obligations of the 1913 bonds against the PRC.

The Court disposed of similar claims based on the 1913 salt bonds in *Morris*, granting the PRC's motion to dismiss because the plaintiff there "suffered no 'direct effect in the United States' sufficient to establish jurisdiction under the commercial activity exception of the FSIA," *Morris*, 478 F. Supp. 2d at 571, and finding in the alternative that the statute of limitations had expired. *Id* at 573. Plaintiffs in the instant action assert that they escape the holdings of *Morris* because their situations differ in three relevant respects.[4] First, these bonds were purportedly purchased by plaintiffs' predecessors on secondary markets in the United States and held here at the time of default. (Pls.' Ltr. May 9, 2007; Am. Compl. ¶ 6). They assert that there has therefore been a direct effect in the United States sufficient to overcome the FSIA jurisdictional barrier. Second, plaintiffs contend that interest payments were made to bondholders within the U.S., and that the voluntary tendering of interest payments here converts a subsequent default on principal into an act with direct effect in the U.S. (Am. Compl. ¶ 13). The Court remains unpersuaded. Finally, plaintiffs assert that because they request equitable relief, their claims are not barred by the statute of limitations. The Court again concludes that if it had jurisdiction, it would find these claims barred by the statute of limitations.

## STANDARD OF REVIEW

Defendant moves to dismiss the complaint under Rule 12(b)(1) on the grounds that the Court lacks subject matter jurisdiction to hear the case because the PRC is

---

[4] A fourth difference, the allegation that payments have been made on other bonds beginning only in the last 6 years, is referred to in Plaintiffs' memorandum of law and made in the initial complaint, but is not alleged in the Amended Complaint. Were it, it would not impact the disposition of this case.

immune from this lawsuit as a sovereign nation. In the context of a Rule 12(b)(1) challenge to jurisdiction under the FSIA, the Court must look to the substance of the allegations to determine whether one of the exceptions to the FSIA's general grant of immunity applies. *See Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). Notwithstanding plaintiffs' averments otherwise, "[t]he plaintiff has the burden of going forward with showing that, under exceptions to the FSIA, immunity should not be granted, although the ultimate burden of persuasion remains with the alleged foreign sovereign." *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) (citations omitted). The Court should look outside the pleadings to submissions by the parties when there are disputed factual issues. *See Filetech S.A. v. Fr. Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998); *Antares Aircraft, L.P. v. Federal Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991) (on a motion "challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits").

Defendant also moves to dismiss the complaint as time-barred under the applicable statute of limitations. "Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss[, which] is properly treated as a Rule 12(b)(6) motion to dismiss." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989). "[S]uch a motion should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) (citations and internal quotation marks omitted). The Court "must accept as true the factual allegations in the complaint, and

draw all reasonable inferences in favor of the plaintiff." *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995) (citations omitted).  The Court may look only at the complaint and "any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits." *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citing *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir. 2002)).

## DISCUSSION

### A. Foreign Sovereign Immunity

Historically, foreign governments were protected from the jurisdiction of U.S. courts by the common law doctrine of absolute sovereign immunity.  As the intensity of international trade expanded, so too did the need to subject foreign sovereigns to the jurisdiction of the courts.  Eventually, the Congress passed the FSIA, which codified sovereign immunity for foreign governments, and also carved out limited exceptions to that immunity.  28 U.S.C. § 1602 *et seq.*; *e.g. Virtual Countries, Inc. v. Rep. Of South Africa*, 300 F.3d 230, 236 (2d Cir. 2002).  The Act provides that "a foreign state shall be immune from [subject matter] jurisdiction . . . except as provided in sections 1605 to 1607" of the FSIA. 28 U.S.C. § 1604. "The FSIA thus provides the sole basis for obtaining [subject matter] jurisdiction over a foreign sovereign in the United States." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611, 112 S. Ct. 2160, 2164, 119 L. Ed. 2d 394 (1992) (internal quotation marks omitted).  Plaintiffs do not dispute that the PRC qualifies as a foreign state for purposes of the FSIA, so this court has subject matter jurisdiction only if one of the statutory exceptions applies.

Plaintiffs invoke the "commercial activity" exception of the FSIA.  This exception provides:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).  Plaintiff has not argued that the first or second clauses apply, so the only question is whether jurisdiction is available pursuant to the third clause.

Subject matter jurisdiction pursuant to the third clause of the commercial activity exception is available when a lawsuit is based upon an act: (1) "outside the territory of the United States"; (2) "that was taken in connection with a commercial activity of [the foreign state] outside this country"; and (3) "that caused a direct effect in the United States."  *Weltover*, 504 U.S. at 611.  As is described in *Morris* and is undisputed by the parties, the first two elements are established.  Thus the only question is whether there was a "direct effect in the United States."

An effect is direct if it "flows as an immediate consequence of the defendant's legally significant act." *Weltover*, 504 U.S. at 618 (citations and internal quotations omitted).  Immediacy "ensures that jurisdiction may not be predicated on purely trivial effects in the United States." *Id.*  "Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994), *cert. denied*, 513 U.S. 1112, 130 L. Ed. 2d

787, 115 S. Ct. 904 (1995), *quoted with approval in Virtual Countries v. Republic of South Africa*, 300 F.3d 230, 236-237 (2d. Cir. 2002).

The primary issue in this case is whether there is a direct effect in the United States when a bond negotiated, consummated, and payable outside of the United States by non-US parties is defaulted on abroad, and then that default results in financial injury to an American after-market purchaser.  Plaintiffs assert that the financial injury caused to secondary market purchasers by the default *itself* constitutes a direct effect in the United States for purposes of the FSIA.  "One factor in evaluating where financial loss is felt is where a corporation is incorporated, or analogously, where a natural person resides," *Morris*, 478 F. Supp. 2d 562, 569 (S.D.N.Y. 2007) (*citing Texas Trading & Milling Corp.*, 647 F.2d 300, 312 (2d Cir. 1981)).  However, the mere fact of financial injury felt by a U.S. plaintiff does not satisfy the direct effects test.  *See Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 240 (2d Cir. 2002) ("plaintiff's more expansive theory, that *any* "U.S. corporation's financial loss constitutes a direct effect in the United States… is plainly flawed.") (emphasis in original) (citations and quotation marks omitted); *Antares Aircraft, L.P. v. Fed. Republic of Nig.*, 999 F.2d 33, 36-37 (2d Cir. 1993) ("the fact that an American individual or firm suffers some financial loss from a foreign tort cannot, standing alone, suffice to trigger the exception.")  *See also Big Sky Network Canada, Ltd. v. Sichuan Provincial Government*, 533 F.3d 1183 (10th Cir. 2008) ("[A]n American corporation's failure to receive promised funds abroad will not qualify as a direct effect in the United States.  The direct effect in such a case is the failure to receive the funds, which occurs abroad . . . and the financial injury, though ultimately felt in the United States, is too attenuated to qualify as a direct.") (citations and

quotation marks omitted).  Thus the financial injury to plaintiffs Pons and Soria cannot, standing alone, suffice to trigger the commercial activity exception.

Where payment on a contract can be and is demanded in the United States, non-payment constitutes a direct effect in the United States.  *E.g. Weltover*, 504 U.S. at 619 (finding that there had been a 'direct effect' in the United States because New York was designated place of payments, and therefore place of performance of ultimate contractual obligations).  However the salt bonds called for payment to be made in five possible cities, each *outside* the United States.  Specifically, the bonds were payable "in London in sterling money of Great Britain," "in Berlin in Marks," "in Paris in Francs," "in St. Petersburg in Roubles," or "in Yokohama in Yen."  (Am. Compl. Ex. F ¶ 5).  Payment on these bonds could not be demanded in the United States, and so the line of cases finding jurisdiction on that basis is inapposite.

Plaintiffs also contend that interest payments were made to their unidentified predecessors within the U.S., and that the voluntary tendering of interest payments here converts a subsequent default on principal elsewhere into an act with direct effect in the United States.  Yet no case interpreting the FSIA supports that proposition.  Rather, the place of performance relevant to the direct effects test is the place where performance could be demanded, and voluntary payments made previously have little bearing on that analysis.  *See Hanil Bank* v. *PT. Bank Negara Indonesia*, 148 F.3d 127, 132 (2d Cir.1998) ("Whether, in the days leading up to a default, payments have or have not been made in a certain location is not a significant factor in [the] direct effect inquiry.").  It is the debtor's *failure* to make payment in New York, where contractually obligated, that causes a direct effect.  *Id.* (citing *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d

238, 241 (2d Cir. 1994)).  Thus any voluntary interest payments that the PRC may have made to predecessor bearers in the United States prior to default do not alter the conclusion that there has not been a direct effect in the United States for purposes of the FSIA.

Although plaintiff is correct that the FSIA was passed in part to give greater access to the courthouse for "those aggrieved by the commercial acts of a foreign sovereign," *Texas Trading & Milling Corp.*, 647 F.2d 300, 312 (2d Cir. 1981), Congress also wanted to balance that goal with the requirement of "some form of substantial contact with the United States." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 490, 103 S. Ct. 1962, 1967, 76 L. Ed. 2d 81 (1983).  Plaintiffs' proposed approach to the direct effects test, one providing for jurisdiction whenever a foreign sovereign's bond default causes financial injury to someone residing in the U.S., would topple that balance. Under plaintiffs' approach, contractual obligations with foreign sovereigns could be opportunistically sold into U.S. courts simply by finding a buyer – or partner – within the United States.  Though the United States enjoys the status of being a world financial center, the FSIA was not meant to make its courts as open as its markets.

These bonds simply bear too little relationship to the United States to overcome the PRC's sovereign immunity.  The only alleged connection between the bonds and the United States is that they were sold here on secondary markets to citizen purchasers, who may have received some interest payments in the United States.  Yet neither of these satisfies the commercial activity exception.  Nothing else connects the bonds with the United States.  The bonds were not negotiated in the United States, did not call for any acts to be performed in the United States, and were neither issued nor payable in United

States currency.  Nor were there any issuing banks or designated administrating agents of

the PRC in the United States.  Further, the contractually designated places of payment

were all cities outside of the United States.  Considering all of the factors, plaintiffs have

not shown a direct effect in the United States sufficient for the FSIA commercial activity

exception, and the provisions of 28 U.S.C. §1605(a)(2) do not permit this court to

exercise jurisdiction over the PRC.

**B. Statute of Limitations**

Even if the FSIA permitted jurisdiction over plaintiffs' claims, they have long

been barred by the statute of limitations.  The contract claims are no different than those

made in *Morris*, and as the Court concluded therein, "plaintiff asserts no legitimate basis

for tolling [claims on the salt bonds] after [the 1980's at the very latest] . . . . Therefore,

the statute of limitations has expired and plaintiff's claim is time-barred." 478 F. Supp.

2d at 573.  Plaintiffs in this action have not alleged any basis on which this Court should

revisit its earlier decision with respect to tolling on the salt bonds.  Accordingly,

incorporating the discussion in *Morris* by reference, the Court finds that plaintiffs'

contract claims are time-barred.

Plaintiffs contend that because they now request equitable relief (in the form of

an injunction forbidding the PRC from paying any of its other debts without paying

plaintiffs a pro rata share), their claims are not barred by the statute of limitations.

However when concurrent legal and equitable remedies are sought based upon one

cause of action, "equity will withhold its relief if the cause of action as to which a legal

remedy is sought is barred by the local statute of limitations." *Williams v. Walsh*, 558

F.2d 667, 671 (2d Cir. 1977); *Luckenbach Steamship Co. v. United States*, 312 F.2d

545, 548 & n.2 (2d Cir. 1963) ("Limitations periods are applicable not to the form of relief but to the claim on which the relief is based."). Plaintiffs have failed to state a separate equitable cause of action. "A 'cause of action' is a situation or state of facts which entitles a party to sustain an action and gives him the right to seek judicial interference in his behalf . . . . [M]ost definitely, the cause of action is something distinct from the remedy or the relief sought." *Walsh*, 558 F.2d at 671 (citations and internal quotation marks omitted). Here, despite their invocations of a purported *pari passu* clause,[5] plaintiffs have but one cause of action: a right to payment on the salt bonds that was breached in 1960 when the PRC defaulted on the bonds. Whether or not they request an equitable remedy for its breach, that cause of action, as explained in *Morris*, is barred by the statute of limitations.

Plaintiffs also attempt to sidestep the statute of limitations on the basis of their requests for an equitable accounting and constructive trust. However, an accounting is unnecessary when an underlying legal action exists, and is properly dismissed when the legal action is time-barred. *See Leveraged Leasing Admin. Corp. v. Pacificorp Capital*, 87 F.3d 44, 49 (2d Cir. 1996). In any event "to plead an equitable action for an accounting under New York law, a plaintiff must allege either a fiduciary or confidential relationship with the defendant." *Banks v. Corr. Servs. Corp.*, 75 F. Supp. 2d 189, 202 (E.D.N.Y. 2007) (internal citations omitted). Plaintiffs have not alleged

---

[5] The Court need not address whether claims related to a valid *pari passu* clause constitute a separate cause of action for statute of limitations purposes, or whether injunctive relief of the kind plaintiffs seek would be appropriate in such circumstances, because the salt bonds did not contain a *pari passu* clause. Rather than placing bond-holders in a superior position to *all* other creditors of the PRC, Article IV of the loan agreement places holders superior to other creditors *only with respect to Salt Administration revenues*. Loan Agreement art. IV ("it shall have priority as regards principal and interest over all future loans, charges, and mortgages charged upon the above-mentioned revenues…") (referring to Salt Administration revenues). Plaintiffs have not alleged that the PRC has recently used Salt Administration revenues to make payments to other creditors, nor is there any reason to believe that the Salt Administration even continued to exist following the 1949 revolution.

any fiduciary or confidential relationship between themselves and the PRC, so no cause of action for accounting lies. Plaintiffs' constructive trust cause of action fairs no better. The adequacy of monetary damages in their contract claim forecloses it, because "a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." *Bertoni v. Catucci,* 117 A.D.2d 892, 498 N.Y.S.2d 902, 905 (N.Y.App.Div.1986). And since "New York law generally requires [for a constructive trust]…a confidential or fiduciary relationship," *E.g. Superintendent of Ins. V. Ochs (In re First Cent. Fin. Corp.),* 377 F.3d 209, 212 (2d Cir. 2004), plaintiffs have failed to plead even the basic elements of a constructive trust.

In sum, plaintiffs have alleged no basis on which this Court should revisit its holding in *Morris* with respect to the statute of limitations. Therefore, the statute of limitations has expired and plaintiffs' claims are time-barred.

## CONCLUSION

For the foregoing reasons, the PRC's motion to dismiss is granted and Plaintiffs Pons' and Soria's Complaint is dismissed in its entirety.

SO ORDERED.

Dated: New York, New York
October 27, 2009

Richard J. Holwell

United States District Judge

13